UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 JAN 19 PM 3: 09

CLERK

BY_____

DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 2:22-cr-00079
)
DAVID CASASOLA-SEGUERO, )
Defendant. )

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
(Doc. 19)

Pending before the court is Defendant David Casasola-Seguero's motion to suppress statements made and physical evidence seized pursuant to a warrantless stop of his vehicle on July 15, 2022. Mr. Casasola-Seguero contends that law enforcement stopped his vehicle without reasonable suspicion of criminal activity in violation of the Fourth Amendment. He filed the pending motion on November 5, 2022. (Doc. 19.) On November 21, 2022, the government opposed Mr. Casasola-Seguero's motion. (Doc. 21.) On December 20, 2022, the court held an evidentiary hearing. After the parties submitted supplemental briefing on January 6, 2023 (Doc. 25) and January 13, 2023 (Doc. 26), the court took the pending motion under advisement.

Mr. Casasola-Seguero is charged in a one-count Indictment with knowingly transporting and moving illegal aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). *See* Doc. 9.

The government is represented by Assistant United States Attorneys Paul J. Van de Graaf and Corinne Smith. Mr. Casasola-Seguero is represented by Assistant Federal Public Defender Mary M. Nerino.

**I.     Findings of Fact.**

The court makes the following findings of fact by a preponderance of the evidence:

On July 15, 2022, Border Patrol Agent Jeffrey Vining, who was based at the

Richford, Vermont Border Patrol station, was conducting a roving patrol in his area of responsibility near the Canadian border. Agent Vining has been a Border Patrol agent for approximately fourteen years with seven of those years spent in El Paso, Texas, and an additional seven years in northern Vermont. He has conducted hundreds of motor vehicle stops in an effort to detect illegal activity near and at the border.

On the day in question, at approximately 4:30 p.m., it was still light outside when he parked his marked Border Patrol vehicle near the intersection of Morse's Line Road (Route 235) and Gore Road (Route 207). Morse's Line Road is a north and south route that starts at the Canadian border and intersects with Gore Road at the approximately half mile point. At that intersection, Morse's Line Road turns east, and Gore Road terminates. These roads provide routes of egress and ingress to and from the border and eventually lead to the interstate. Individuals engaged in illegal border crossing are often dropped off in Canada to cross the border on foot and are instructed to wait for a pick-up driver in the United States.

The location at which Agent Vining parked was on a slight rise in a field from which he had an unobstructed view of traffic from both directions, and which allowed him to identify an approaching vehicle from a considerable distance. The surrounding area is extremely rural with only a small number of farms and residences. The topography consists of agricultural fields and pastures, woods, marshes, and wetlands. Traffic is generally light even during "rush" hour when residents are leaving and returning from work. Agent Vining knows many of the residents by name or appearance and is familiar with many of the vehicles they drive. It is typical for local vehicles to travel at or in excess of the posted speed limit. According to Agent Vining, it is "very abnormal" to see a vehicle with out-of-state plates at night in this area and it is also unusual to see a vehicle without dust or dirt from the nearby dirt roads and driveways. Agent Vining credibly testified that he had patrolled this area "countless" times before the incident in question.

While parked in his elevated location, at approximately 9:30 p.m., Agent Vining observed that traffic consisted of approximately one vehicle every fifteen to thirty

minutes. He spotted a vehicle heading east on Gore Road "well below the speed limit." As the vehicle approached his location with its headlights on, he could see that it was clean, had out-of-state plates, and was a vehicle that he did not recognize as belonging to a local resident. The vehicle had standard tinting in its back passenger seat area consistent with a rental car. As the vehicle passed him, he turned on his vehicle's "take down" lights which illuminated the area in front of his vehicle. In the passing vehicle, he observed an operator whose gender and race were unknown and what appeared to be a female (by virtue of her long hair) in the front passenger seat holding a cell phone or iPad with an illuminated screen close to her face. Based on his training and experience, he knew that operators of vehicles involved in illegal border activity often use cell phones to text individuals who have crossed the border illegally. They also use cell phones to access GPS so that they can navigate in an unfamiliar area. He was able to see into the back passenger seat of the vehicle and saw no other occupants. After he waited for the vehicle to pass out of sight, he began following it to conduct surveillance.

The vehicle had been out of Agent Vining's sight for approximately two minutes when he saw it parked partially in a driveway to a farm near the intersection of Dandurand Road and Route 235 in Franklin, Vermont. Agent Vining knows the resident of the farm to which the driveway leads and did not recognize the vehicle as belonging to that person. The vehicle, a green Mitsubishi Outlander with South Carolina plates, had its reverse lights illuminated. Although Agent Vining was able to determine the Outlander's license plate number, the system for checking it was not operating at the time. Based on his training and experience, Agent Vining suspected it was a rental vehicle because of its clean condition and its out-of-state plates. He credibly testified that rental vehicles are frequently used to facilitate smuggling activities to avoid having personal vehicles involved in criminal activity.

The area surrounding Dandurand Road is a known as a "lay-up/load-up" area for illegal border crossings as evidenced by discarded Canadian water bottles, wet clothing, old shoes, and matted grass. In the weeks preceding the incident, Agent Vining credibly testified that there had been "a decent amount of illegal activity in the area" including

3

arrests, although he had received no specific alerts on the night in question.

Agent Vining continued to travel eastbound, at which point he observed the Outlander pull out of the driveway and begin traveling west, in the direction from which it came. Agent Vining immediately made a U-turn and followed the Outlander westbound. As he did so, he noticed that the Outlander had significantly increased its speed. Using his Border Patrol vehicle's take down lights, he was able to observe four individuals in the rear passenger seat with bags in their laps. The Outlander continued to head west on Gore Road/Route 207 until approximately 9:45 p.m., at which point Agent Vining conducted a motor vehicle stop of it near the intersection of Gore Road and Tarte Road in Highgate, Vermont. The location of the traffic stop was approximately a half mile from the border on a route that led to the interstate as well as to the City of St. Albans.

## II.    Conclusions of Law and Analysis.

Mr. Casasola-Seguero argues that the stop of his vehicle was not supported by a reasonable suspicion of criminal activity. Under *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer may make a brief investigative stop based upon reasonable suspicion that "criminal activity may be afoot[.]" *Id.* at 30. The officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Reasonable suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause[.]" *United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to support such a stop. *Terry*, 392 U.S. at 27. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Border patrol agents on roving patrol are also subject to *Terry*'s reasonable suspicion standard. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (explaining that agents "on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that

4

reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country"); *see also United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005) (explaining that officers on roving patrol must have a "particularized and objective basis for suspecting legal wrongdoing" in light of the "totality of the circumstances") (internal quotation marks omitted). When a border patrol agent has a reasonable suspicion of criminal activity, "he may stop the car briefly and . . . question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances[.]" *Brignoni-Ponce*, 422 U.S. at 881-82.

In forming reasonable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *Cortez*, 449 U.S. at 419.

The following factors may support or negate a reasonable suspicion:

(1) characteristics of the area where the vehicle is found; (2) its proximity to the border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress.

*Singh*, 415 F.3d at 294 (citing *Brignoni-Ponce*, 422 U.S. at 884-85). The court must take "the totality of the circumstances" or "the whole picture" into account, *Cortez*, 449 U.S. at 417, and should not view these factors "in isolation from each other[.]" *Arvizu*, 534 U.S. at 274. "This list is not exhaustive and . . . the fact that some factors are suspicious" while "others appear innocent does not defeat a finding of reasonable suspicion." *Singh*, 415 F.3d at 294-95.

Mr. Casasola-Seguero asserts that Agent Vining lacked a reasonable suspicion of criminal activity because he did not observe a traffic violation, evasive or erratic driving,

5

or other criminal wrongdoing. He also had not received a report of an illegal border crossing on the day or night in question. The government counters that all eight *Singh* factors justified Agent Vining's traffic stop of Mr. Casasola-Seguero's vehicle.

Agent Vining observed Mr. Casasola-Seguero operating a vehicle approximately a half mile from the U.S.-Canadian border. "Although . . . proximity to the border does not alone constitute reasonable suspicion for a Border Patrol stop that is not at the border or its functional equivalent, this 'vital element' contributes significantly to the reasonableness of the Border Patrol agents' suspicion." *United States v. Nichols*, 142 F.3d 857, 867 (5th Cir. 1998); *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (considering the stop's "proximity to the border," a "paramount factor in determining reasonable suspicion") (internal quotation marks omitted).

The area in which the traffic stop occurred was one frequently used for illegal alien and drug smuggling. *See Singh*, 415 F.3d at 295 (observing a vehicle "on a rural road near the U.S.-Canadian border in an area where illegal immigrants frequently attempt to enter the United States" may weigh in favor of finding that a stop was supported by reasonable suspicion). Agent Vining, an experienced border patrol agent, was aware of recent use of the area for these purposes, including recent arrests, and he described the evidence of such activity such as Canadian water bottles, discarded wet clothing, and matted grass consistent with someone who had crossed the wooded and marshy area on foot and was waiting for a pick-up. *See Brignoni-Ponce*, 422 U.S. at 885 (noting a court may consider a border patrol agent's "previous experience with alien traffic" in the area in determining the lawfulness of a traffic stop); *United States v. Quintana-Garcia*, 343 F.3d 1266, 1272 (10th Cir. 2003) (observing traffic stop made "50-60 miles from the U.S.-Mexico border" was "an area close enough to the border to find illegal entrants who actually are walking . . . into the United States") (internal quotation marks and brackets omitted); *United States v. Ochoa*, 2022 WL 3584858, at *1, 3, 5 (D. Ariz. Aug. 22, 2022) (noting that stop occurred in "an area that is less than a mile from the international border and is well-known for alien smuggling" and citing officer's "training and experience" as contributing to reasonable suspicion).

6

Agent Vining reasonably suspected that the vehicle Mr. Casasola-Seguero was operating was a rental vehicle[1] because it was clean and had out-of-state plates in a location and at a time where it would be "highly abnormal" to see a vehicle with out-of-state plates that had not traveled on the surrounding dirt roads and driveways. *See Nichols*, 142 F.3d at 871 ("[A]lthough there is nothing inherently suspicious about a clean white truck[,] . . . suspicion is reasonable when that truck is . . . on a road where such trucks are usually dirty due to ranch work"); *United States v. Villalobos*, 161 F.3d 285, 289 (5th Cir. 1998) (finding stop justified by reasonable suspicion when, among other things, arresting agents were familiar with area residents and did not recognize defendant's truck as a local vehicle); *see also United States v. Gomez-Lotero*, 2015 WL 5123249, at *4 (D. Vt. Aug. 31, 2015) (denying motion to suppress where, among other things, vehicle with New Jersey plates was stopped on an unpaved road in Vermont at 1:30 a.m. that "normally [saw] only local traffic during the day and no traffic at 1:30 a.m[.]" and where an illegal trafficking incident had recently occurred).

Mr. Casasola-Seguero's vehicle was traveling well below the speed limit and its sole passenger appeared to be either texting or using GPS which was consistent with an operator and a passenger who were unfamiliar with the area. *See Nichols*, 142 F.3d at 866 (citing the "unusually slow speed" of the vehicle when "traffic at that time was very light" as relevant to reasonable suspicion analysis). Although "[c]areful, lawful driving gives little support to establishing reasonable suspicion[,]" *United States v. Hernandez-Lopez*, 761 F. Supp. 2d 1172, 1189-90 (D.N.M. 2010), operation that is inconsistent with normal traffic patterns is noteworthy. *See Singh*, 415 F.3d at 291 (affirming that reasonable suspicion justified stop when, among other things, defendant drove slowly on

---

[1] The vehicle's potential status as a rental vehicle alone warranted further investigation, however, Agent Vining did not confirm its status until after the stop. *See United States v. Garcia-Barron*, 116 F.3d 1305, 1306-07 (9th Cir. 1997) ("The second factor supporting the . . . finding of reasonable suspicion is Appellant's use of a rental car. . . [The agent testified that] most of the rental cars he had stopped during the previous two years were transporting persons subsequently charged with immigration violations."); *United States v. Korb*, 464 F.2d 456, 457 (9th Cir. 1972) (finding probable cause based upon, among other things, an officer's knowledge that "a rented car is a common modus operandi among marijuana, narcotics, and alien smugglers").

rural road and tapped breaks repeatedly, "a common signal used to alert aliens attempting
to cross the border illegally that a vehicle is waiting to pick them up"); *United States v.
Berber-Tinoco*, 510 F.3d 1083, 1089-90 (9th Cir. 2007) (noting that "braking
periodically, stopping at known pick-up areas, and finally turning around and reversing
direction" in a "rural, remote area" where "local traffic would normally travel around 55
miles per hour" contributed to reasonable suspicion). At the time of Agent Vining's
initial sighting of the vehicle, there were no residences or commercial businesses in sight.
*See Nichols*, 142 F.3d at 866-67 (describing the area of the traffic stop as "a kind of
nowhere land" including "no development other than ranches within twenty miles" as
facts supporting reasonable suspicion). The characteristics of the area where the vehicle
was found, its proximity to the border, the usual traffic patterns on the road, and Agent
Vining's previous experience with alien traffic in the area thus all contributed to a
reasonable suspicion.

Following Mr. Casasola-Seguero's vehicle, Agent Vining lost sight of it for
approximately two minutes, however, there was no evidence that it had stopped or turned
off the road. Shortly thereafter, he saw a vehicle with out-of-state plates with its reverse
lights on which appeared to be backing out of a driveway to perform a U-turn. He knew
the resident of the farm to which the driveway led, and he believed the vehicle did not
belong to her. It also did not appear to be approaching her residence. *See United States v.
Montero-Camargo*, 208 F.3d 1122, 1137 (9th Cir. 2000) (explaining that "turning off the
highway and turning around are not in themselves suspicious" but "a turnaround
combined with other factors may be considered as part of a reasonable suspicion
analysis") (internal quotation marks and brackets omitted).

Using his take-down lights, Agent Vining was able to confirm that Mr. Casasola-
Seguero's vehicle had several backseat occupants with bags, consistent with a recent
pick-up. Indeed, there was no other reasonable explanation for these additional
passengers. *See United States v. Robles-Avalos*, 895 F.3d 405, 409 (5th Cir. 2018)
(holding a traffic stop was justified by reasonable suspicion when the vehicle under
surveillance was observed with "numerous additional passengers"); *see also United*

8

*States v. Dusablon*, 534 F. Supp. 1368, 1375 (D. Me. 1982) ("The appearance of an unaccounted-for passenger in a station wagon which had just 'given the slip' to [Border Patrol officials] near the border minutes before and which was being driven by a person suspected of participation in a recent walk-around attempt in the same area, . . . prompted an entirely reasonable suspicion that the [defendant's] vehicle was involved in a walk-around."). In light of the location as a known area of alien smuggling, the proximity of the border, Mr. Casasola-Seguero's potential use of a rental car, the "highly abnormal" location of an out-of-state vehicle in the rural location at a time of night in which there was little or no traffic, and the unexplained presence of additional passengers with bags, Agent Vining's suspicion that he was witnessing alien smuggling was a reasonable one. *See Arvizu*, 534 U.S. at 277 (noting the court must give "due weight to the factual inferences drawn by the law enforcement officer").

Turning around his Border Patrol vehicle, Agent Vining noticed that Mr. Casasola-Seguero's vehicle was picking up speed and heading toward the interstate as if its operator had accomplished his or her objective and was eager to leave the area. *See Quintana-Garcia*, 343 F.3d at 1273 (crediting Border Patrol agent's experience that "smugglers move as quickly as possible through the border area to make certain that their presence for any protracted period doesn't expose them to interception") (internal quotation marks and brackets omitted). To investigate further, Agent Vining performed a traffic stop.

Viewed in isolation each fact alone may not support a reasonable suspicion, however, a "divide-and-conquer analysis" is impermissible. *Arvizu*, 534 U.S. at 274. The totality of the circumstances provides ample support for Agent Vining's reasonable suspicion based upon specific articulable facts that Mr. Casasola-Seguero was engaged in alien smuggling. As a result, Agent Vining's stop of Mr. Casasola-Seguero's vehicle did not violate the Fourth Amendment. *See Brignoni-Ponce*, 422 U.S. at 881 ("[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may

contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.").

## CONCLUSION

For the foregoing reasons, Mr. Casasola-Seguero's motion to suppress evidence is DENIED. (Doc. 19.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __19th__ day of January, 2023.

Christina Reiss, District Judge
United States District Court

10